IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

**TONY BURNETT, et al.,**

    **Plaintiffs,**

v.                                                                        Case No.:  3:13-cv-14207

**FORD MOTOR COMPANY,**

    **Defendant.**

### MEMORANDUM OPINION and ORDER

Pending before the Court is Defendant Ford Motor Company's Motion for Protective Order. (ECF No. 244). Plaintiffs have filed a memorandum in opposition to the motion, (ECF No. 256), and Ford Motor Company ("Ford") has replied. (ECF No. 272). In the Motion, Ford seeks an Order pursuant to Fed. R. Civ. P. 26(c) forbidding Plaintiffs from discovering Ford's source code for its Electronic Throttle Control system. On Wednesday, April 1, 2015, the undersigned heard oral argument on the motion.

The Court has thoroughly considered the arguments of the parties and **DENIES** Ford's Motion for a Protective Order prohibiting discovery of its source code. However, the Court **GRANTS** Ford's Motion to the extent that it requests a protective order, separate from the universal protective order already entered in this case, (ECF No. 128), which is tailored to fit Ford's particular concerns related to sharing its highly proprietary commercial information with Plaintiffs. The parties are **ORDERED** to meet

and confer regarding the terms of the special protective order and shall tender an Agreed Order Governing Disclosure of Ford's Source Code to the undersigned no later than **April 13, 2015**. If the parties cannot agree on the terms, they shall submit their respective versions to the undersigned by electronic mail no later than 12:00 noon on April 13, 2015, and the disputed issues shall be addressed at the regularly scheduled telephone conference on April 15, 2015.

I. **Relevant Facts**

These cases involve alleged events of sudden unintended acceleration in certain Ford vehicles manufactured between 2002 and 2010. In particular, Plaintiffs claim that their vehicles were equipped with defective Electronic Throttle Control ("ETC") systems which were not fault tolerant, resulting in open throttle events during which the drivers of the vehicles lacked the ability to control the throttles. Plaintiffs assert that the mechanisms causing the throttles to open unexpectedly were numerous; included electromagnetic interference, resistive shorts, and other voltage and resistance fluctuations; and these issues were known to Ford. However, despite having knowledge of the potential for sudden unexpected acceleration, Ford failed to properly design the ETC system to correct the events when they occurred, and further neglected to install fail-safes, such as a Brake Over Accelerator system, that would allow the drivers to physically prevent or mitigate sudden acceleration.

In the course of discovery, Plaintiffs requested that Ford produce for inspection and review the source code for the ETC system. Ford objected, and the parties were unable to resolve the issue in informal discussions. Accordingly, Ford filed the instant motion for protective order, asking the Court to prohibit disclosure of the source code in its entirety. In the event the Court allowed discovery of the source code, Ford requested

that the Court enter a special protective order setting more stringent terms and conditions in relation to the review and use of the source code.

## II. Position of the Parties

"Computer programs are made up of lines of text written in a computer language, called the 'source code' of that program." *SAS Institute Inc. v. World Programming Ltd.*, --- F.Supp.3d ----, 2014 WL 6978300, at *2 (E.D.N.C. Sept. 29, 2014). According to Ford, the source code sought by Plaintiffs is "highly proprietary and confidential software embedded on the Powertrain Control Module ("PCM") of Ford vehicles that, among other functions, specifies the general operation of the Electronic Throttle Control system." (ECF No. 244 at 1). Ford claims that the source code acts as the "nerve center" of each vehicle; therefore, the source code is one of Ford's most valuable trade secrets. Consequently, if the source code is improperly disclosed, Ford will suffer irreparable harm.

Nevertheless, the main thrust of Ford's motion for protective order is that the source code should not be subject to discovery, because it is not relevant to the claims or defenses in this case. Ford argues that Plaintiffs have made no allegations that the source code is defective, or that it causes the sudden unexpected acceleration events about which Plaintiffs complain. Instead, Plaintiffs contend that the ETC's design is defective, and they already have all of the materials that are relevant to that claim, including the design, modification, and testing documents. Moreover, given that the source code is embedded in the Plaintiffs' vehicles in an inalterable form, Plaintiffs can subject their vehicles to "real-world on-road or laboratory testing in order to evaluate the functioning of the source code" without the need to review the code itself. (ECF No. 244 at 7-8). Ford maintains that Plaintiffs' request for the source code is nothing more

3

than a fishing expedition, pointing out that only recently Plaintiffs represented to the Court that they had enough evidence at this stage in the discovery process to support an order granting preliminary injunctive relief. Ford reasons that if Plaintiffs can meet that heavy evidentiary burden without access to the source code, the code must play no significant role in the case.

In response, Plaintiffs argue that Ford's motion is both illogical and untenable in view of the broad scope of discovery allowed under Rule 26. Plaintiffs allege that Ford's ETC system is defective, in part, because it fails to detect and address multiple faults occurring at the same time. Thus, evidence pertaining to how the ETC detects and addresses faults is obviously relevant to their claims. Given that the ETC system operates as directed by the source code, the code is, *ipso facto*, "key evidence central to proving the allegations of how the ETC system is programmed to detect and address faults." (ECF No. 256 at 5). Plaintiffs disagree that they are required to allege a specific defect in the source code before they can request the code in discovery. To the contrary, until they can see it, Plaintiffs claim that they are not in a position to pinpoint a specific flaw. They know that the ETC system is defective because it allows the throttle to open when the driver is not pressing on the gas pedal, resulting in unintended acceleration. The defect may be in the hardware, in the software, or in both. However, in Plaintiffs' view, they are entitled to full discovery of the entire system and all of its components, including the source code, before that question must be answered.

### III. <u>Relevant Law</u>

Federal Rule of Civil Procedure 26(b)(1) provides that:

Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books,

4

> documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter ... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

While the claims and defenses raised in the case should be the focus of discovery, broader discovery is permitted when justified by the particular needs of the case. Fed. R. Civ. P. 26(b)(1), advisory committee notes (2000). In general, information is relevant, and thus discoverable, if it "'bears on, or ... reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case. Although 'the pleadings are the starting point from which relevancy and discovery are determined ... [r]elevancy is not limited by the exact issues identified in the pleadings, the merits of the case, or the admissibility of discovered information.'" *Kidwiler v. Progressive Paloverde Ins. Co.*, 192 F.R.D. 193, 199 (N.D.W.Va. 2000) (internal citations omitted). In many cases, "the general subject matter of the litigation governs the scope of relevant information for discovery purposes," *Id.* The party resisting discovery, not the party seeking discovery, bears the burden of persuasion. *See Kinetic Concepts, Inc. v. ConvaTec Inc.,* 268 F.R.D. 226, 243–44 (M.D.N.C. 2010)(citing *Wagner v. St. Paul Fire & Marine Ins. Co.,* 238 F.R.D. 418, 424–25 (N.D.W.Va. 2006)).

Simply because information is discoverable under Rule 26, however, "does not mean that discovery must be had." *Schaaf v. SmithKline Beecham Corp.*, 233 F.R.D. 451, 453 (E.D.N.C. 2005) (citing *Nicholas v. Wyndham Int'l, Inc.,* 373 F.3d 537, 543 (4th Cir. 2004)). For good cause shown under Rule 26(c), the court may restrict or prohibit discovery when necessary to protect a person or party from annoyance, embarrassment, oppression, or undue burden or expense. Fed. R. Civ. P. 26(c). In addition, Rule 26(b)(2)(C) requires the court, on motion or on its own, to limit the

frequency and extent of discovery, when (1) "the discovery sought is unreasonably cumulative or duplicative;" (2) the discovery "can be obtained from some other source that is more convenient, less burdensome, or less expensive;" (3) "the party seeking the discovery has already had ample opportunity to collect the requested information by discovery in the action;" or (4) "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii). This rule "cautions that all permissible discovery must be measured against the yardstick of proportionality." *Lynn v. Monarch Recovery Management, Inc.,* 285 F.R.D. 350, 355 (D.Md. 2012) (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.,* 269 F.R.D. 497, 523 (D.Md. 2010)). To insure that discovery is sufficient, yet reasonable, district courts have "substantial latitude to fashion protective orders." *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 36, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984).

  Federal Rule of Civil Procedure 26(c)(1)(G) allows the court, for good cause, to issue an order "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." In order for the court to apply the rule, two criteria must exist. First, the material sought to be protected must be "a trade secret or other confidential research, development, or commercial information." Second, there must be a "good cause" basis for granting the restriction. The party seeking protection bears the burden of establishing both the confidentiality of the material and the harm associated with its disclosure. *Deford v. Schmid Prods. Co.,* 120 F.R.D. 648, 653 (D.Md. 1987) (citing *Cipollone v. Liggett Group, Inc.,* 785 F.2d. 1108, 1121 (3rd Cir. 1986)). Once these elements are

6

demonstrated, the burden shifts to the party seeking disclosure to show that the material is relevant and necessary to its case. *Empire of Carolina, Inc. v. Mackle,* 108 F.R.D. 323, 326 (D.C. Fla. 1985). The court "must balance the requesting party's need for information against the injury that might result if uncontrolled disclosure is compelled." *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 787 (3rd Cir. 1994) (quoting Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts,* 105 Harv.L.Rev. 427, 432–33 (1991).

If the court determines that disclosure is required, the issue becomes whether the materials should be "revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(G) "Whether this disclosure will be limited depends on a judicial balancing of the harm to the party seeking protection (or third persons) and the importance of disclosure to the public." *Id.* Factors to consider when deciding if and how to limit disclosure include:

> (1) whether disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate purpose or for an improper purpose; (3) whether disclosure of the information will cause a party embarrassment; (4) whether confidentiality is being sought over information important to public health and safety; (5) whether the sharing of information among litigants will promote fairness and efficiency; (6) whether a party benefiting from the order of confidentiality is a public entity or official; and (7) whether the case involves issues important to the public.

*Pansy,* 23 F.3d at 787-91. The court exercises broad discretion in deciding "when a protective order is appropriate and what degree of protection is required, *Furlow v. United States,* 55 F.Supp.2d 360, 366 (D.Md. 1999) (quoting *Seattle Times Co.,* 467 U.S. at 36).

### IV.  Discussion

Plaintiffs complain that their Ford vehicles share a common defect of the ETC system, which allows their vehicles to suddenly and unintentionally accelerate. They

allege that the ETC system is unable to detect and address more than one fault at a time, and this deficiency is a reason that the system is susceptible to events of unintended acceleration. Moreover, the vehicles lack fail-safes, such as Brake Over Accelerator programming, to compensate for the deficits in the ETC system. In light of Plaintiffs' claims, discovery pertaining to the operation of the ETC system is relevant. The source code is the foundation of the ETC's operating system; accordingly, it is relevant. Indeed, as Plaintiffs emphasized, when the NASA Engineering and Safety Center ("NESC") studied the issue of sudden unintended acceleration in Toyota vehicles in 2010, NESC reviewed design, design engineering, drawing, and schematics, but also spent considerable time evaluating and analyzing the relevant ETC system's source code. *See* National Highway Traffic Safety Administration Toyota Unintended Acceleration Investigation, NESC Assessment #: TI-10-00618.[1] According to NESC's report, the investigators looked specifically for potential algorithms or logic issues in the source code that could lead to inadvertent throttle opening. Although NESC ultimately failed to uncover a specific defect in Toyota's ETC operating system, a thorough evaluation of the issue required assessment of the source code. Ford's attempt to distinguish the Toyota situation from the present case is unconvincing given that in both instances the fundamental claim was and is that unintended accelerations are related to the operation of the ETC system. Thus, the categories of information reviewed by NASA engineers as part to their investigation of that claim certainly provides guidance to the Court when determining what materials are relevant to discovery in this case.

---

[1] Available at http//www.dot.gov/briefing-room/us-department-transportation-releases-results-nhstsa-nasa-study-unintended-acceleration.

Similarly, Ford's argument that Plaintiffs are not entitled to the source code because they already have "the design, modification, and testing documents related to the ETC system that are relevant to and necessary for the analysis and development of their defect theory" is not persuasive. (ECF No. 244 at 7). In Ford's view, because Plaintiffs have these materials, they do not need the source code, thereby rendering the source code irrelevant. However, Plaintiffs should not be forced to rely on Ford's determination as to what is the "most relevant" evidence in its possession. The source code is not duplicative or cumulative. Rather, it reflects an important step in the production of the ETC system between the system's design and the testing phases. Ford cites to a number of cases in which courts denied requests for the production of source code, but those cases largely involve patent or infringement claims in which the requested portions of source code were not at issue. Here, how the ETC system was programmed to detect and address faults is at issue. Ford has supplied no case law factually similar to the instant action; therefore, no circuit precedent exists prohibiting the production of source code under similar circumstances.[2]

Having determined that the source code is relevant, the Court notes that the parties agree that the code is proprietary and deserves special protection. Ford represents that the source code is still in use, and its disclosure would result in substantial financial harm to Ford. Plaintiffs do not dispute this representation. Accordingly, the parties shall meet and confer regarding reasonable restrictions to place on the review and use of the source code. For one thing, Ford shall determine whether the portion of the source code pertaining to the ETC system can be segregated from the

---

[2] In all fairness, the undersigned could find no cases directly on point either, although Plaintiffs found one out-of-circuit opinion in which a court's discussion of *Daubert* motions and rulings revealed that source code had been disclosed to various expert witnesses. *See In re Toyota Motor Corp. Unintended Acceleration,* 978 F.Supp.2d 1053, 1077-78, 1080-83 (C.D.Cal. 2013).

9

remaining source code embedded in the Powertrain Control Module. If the portion involving the ETC system can be segregated, then Ford is only required to produce the portion of the source code pertaining to the ETC system.

The Clerk is directed to provide a copy of this Order to counsel of record and any unrepresented party.

**ENTERED:** April 3, 2015

_____
Cheryl A. Eifert
United States Magistrate Judge