IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

TONY BURNETT, et al.,

        **Plaintiffs,**

v.                                      **Case No.:  3:13-cv-14207**

FORD MOTOR COMPANY,

        **Defendant.**

## MEMORANDUM OPINION and ORDER

Pending before the Court are two related motions: Ford Motor Company's ("Ford") Motion to Quash Notice of Deposition and for Protective Order, (ECF No. 357), and Plaintiffs' Motion for Reconsideration, (ECF No. 393). Both motions have been thoroughly briefed by the parties.[1] Moreover, issues underlying the motions have been discussed at several discovery status conferences. Consequently, the undersigned finds the motions to be fully developed and ready for resolution, without the need for oral argument.

Having carefully considered the arguments of the parties, the Court **DENIES** Ford's Motion to Quash the Notice of Deposition; **GRANTS**, in part, and **DENIES**, in part, Ford's Motion for a Protective Order; and **GRANTS**, in part, and **DENIES**, in part, Plaintiffs' Motion for Reconsideration, as more fully discussed below.

---

[1] Plaintiffs also filed a motion to seal three confidential documents attached as exhibits to their Motion for Reconsideration, (ECF No. 402). The Court **GRANTS** Plaintiffs' motion for good cause shown. Considering that these exhibits were attached to a discovery motion, rather than a dispositive motion, the undersigned finds that sealing the exhibits does not improperly interfere with the public's right to access court documents.

I.      <u>Relevant Facts and Procedural History</u>

These cases involve alleged events of sudden unintended acceleration in certain Ford vehicles manufactured between 2002 and 2010.  In particular, Plaintiffs claim that their vehicles were equipped with a defective Electronic Throttle Control ("ETC") system that was not fault tolerant, resulting in open throttle events that could not be prevented or corrected by the drivers. Plaintiffs assert that the mechanisms causing the throttles to open unexpectedly were numerous; included electromagnetic interference, resistive shorts, and other voltage and resistance fluctuations; and these issues were known to Ford. However, despite having knowledge of the potential for sudden unexpected acceleration, Ford failed to properly design the ETC system to correct the events when they occurred, and further neglected to install fail-safes, such as a Brake Over Accelerator ("BOA") function, that would allow drivers to physically prevent or mitigate sudden acceleration by applying the brakes.

Discovery in the present cases began in late July 2014, with the first formal dispute occurring in mid-September 2014. By December, Plaintiffs requested regularly scheduled discovery conferences in an effort to expedite what they anticipated would be voluminous discovery. A discovery status conference was held on December 17, 2014, during which the undersigned set a schedule for bi-weekly discovery conferences to be held, for the most part, telephonically. The first discovery conference took place on January 7, 2015 and primarily addressed the status of unanswered and allegedly inadequately answered discovery requests. In addition, the parties reported on their progress in establishing agreed protocols for depositions, discovery of electronically stored information ("e-discovery"), and clawback requests.

At the February 10, 2015 conference, Plaintiffs raised concerns regarding the

2

reasonableness of the searches being performed by Ford in its effort to respond to Plaintiffs' requests for documents. In particular, Plaintiffs were disturbed by the lack of electronic mail ("e-mail") in the document productions. Indeed, Ford conceded that it had not produced e-mail in certain instances, because it did not understand that the request sought e-mail communications. Nonetheless, Ford represented to the Court that for ten to twenty specific individuals identified by Ford as having the most involvement in the design, development, and failure modes and effects analysis of Ford's ETC systems, Ford had already commenced a "sweep" of their e-mails, searching for terms either identified by Plaintiffs, or otherwise designed to uncover relevant documents. (ECF No. 327 at 27-28).[2] Ford described the sweep as a "self-selection" process being conducted by the individual employees, who had each been given information about Plaintiffs' claims, as well as suggested search terms. Ford explained that its employees were allotted limited space on company servers for the collection and storage of e-mail. Accordingly, the employees kept a Personal Filing Cabinet ("PFC") folder on their hard drives in which they stored e-mails. For that reason, the employees were personally conducting the required searches of their PFC files. After further discussion, it became clear that the parties had never agreed on a set of keywords and phrases for the employees to use when searching their electronic files, and an e-discovery protocol had not yet been implemented. Accordingly, the Court ordered the parties to meet, confer, and agree on search terms, so that Ford could provide those terms to the employee custodian (ten identified for design and development of the ETC system and ten identified for the failure modes and effects

---

[2] Citations to hearing transcripts refer to the docket numbers of transcripts filed in the lead case, *Johnson v. Ford Motor Company,* No.: 3:13-cv-06529.

analysis). (*Id.* at 32-35).

As the conference continued, Plaintiffs reiterated and supplemented their concerns regarding Ford's document production up to that date. Plaintiffs advised the Court that they had deposed several Ford employees and had received troubling responses when asking the employees about their search for relevant documents. For instance, one employee testified that he made no effort to search for documents concerning the ETC system. Rather, he had been asked to limit his search to information about a BOA function implemented by Ford in 2011. A similarly restricted search had been made by one of Ford's senior engineers, Ms. Kelly Arbanas, notwithstanding her extensive involvement in the development of the ETC system. Ms. Arbanas reportedly testified that she was never asked to collect documents, including e-mails, regarding the ETC system. Another employee, Mr. Eric Luehrsen, was identified by Ford as an individual that had no responsive documents in his custodial file, yet Plaintiffs located hundreds of relevant documents in other productions that were either authored or received by Mr. Luehrsen. Plaintiffs likewise uncovered over 200 documents that were authored or received by Mr. Baum, an employee also identified by Ford as having no responsive documents in his custodial file. (ECF No. 327 at 44-48). Plaintiffs expressed grave doubts that the self-selection process used by Ford to collect relevant documents was reasonable. In response, Ford disputed Plaintiffs' factual representations and further pointed out that while the document searches were underway, they were not completed. (*Id.* at 49-52). Ford represented that it had produced thousands of pages of relevant information, including documents from all of the witnesses mentioned by Plaintiffs. Moreover, Ford reassured the Court and Plaintiffs that searches were being done as promptly as

4

possible, expressing its frustration with the breadth of Plaintiffs' discovery requests.

After listening to the parties, the undersigned expressed misgivings regarding the timeliness and effectiveness of Ford's search and its subsequent productions. (*Id.* at 52-60). However, as the parties regularly supplied contradictory reports to the Court about the status of discovery, and generally failed to supply evidence supporting their reports, the undersigned was not in a position to determine which party's representations were accurate. (Id. at 62). Consequently, Plaintiffs were advised to take some depositions and investigate through the testimony whether Ford's searches were reasonable. If Plaintiffs concluded that Ford had not met its discovery obligations, they were encouraged to bring a motion to compel and for sanctions. In the meantime, the parties were again ordered to meet, confer, and agree on keywords and phrases to search the electronically stored information ("ESI"), and were strongly urged to include their IT experts in the discussions. (ECF No. 327 at 78).

By February 18, 2015, the parties had met and conferred on several occasions and had included their IT experts. (ECF No. 345 at 5-10). They had not yet agreed on search terms, but were making progress. Ford had decided to involve a third-party vendor in the document collection process, which was expected to hasten Ford's productions. During the March 4 conference, Ford represented that it had provided Plaintiffs with the names of custodians for whom keyword searches would be appropriate, and had continued to search its records by having employees self-select documents responsive to discreet discovery requests. (ECF No. 400 at 31). However, the parties disagreed as to whether Ford should be expected to search the hard drive of every employee identified by Plaintiffs, although the parties were still discussing

this option. With respect to agreed-upon search terms, the parties continued to struggle. For the first time, Plaintiffs raised the issue of whether Ford should be compelled to share with Plaintiffs the search terms that were currently being used by Ford in its document identification and retrieval process. (*Id.* at 46-49). Ford objected to sharing its search terms on two grounds. First, Ford contended that the search terms used were protected attorney work product. Second, Ford indicated that a "list" of search terms did not exist, because Ford had allowed each individual employee to develop his or her own terms and phrases to search his or her documents, after having met with counsel and discussed the nature of the litigation. (*Id.*).

The next time Plaintiffs raised issues touching on the adequacy of Ford's search for documents was April 15, 2015. (ECF No. 448 at 12-16). At this discovery conference, Plaintiffs reported that the parties had negotiated a list of search terms, and Ford had swept the records of two test custodians to determine the efficacy of the terms. Unfortunately, although not entirely unexpectedly, the parties now disagreed as to whether the terms had returned more relevant than non-relevant documents. Plaintiffs complained that Ford refused to share a search report with them that would reflect which terms returned the most, or the least documents, while Ford insisted that the search report would not assist in resolving problems with the search terms. Consequently, the parties were at another stalemate, unable to agree on if, and how, the list of search terms and phrases should be revised. (*Id.* at 15-20). To move the matter forward, the Court ordered Ford to share the search report with Plaintiffs. Plaintiffs also requested that Ford be compelled to share with them the names of all records custodians whose personal files had been searched for responsive documents.

6

Ford objected and indicated that it intended to formally argue this issue in a motion for protective order.

At the May 13, 2015 discovery conference, Plaintiffs again expressed misgivings with Ford's document production. (ECF No. 499 at 13-15). Plaintiffs explained that Ford had produced the names of the ten people most important to the design and development of the ETC system, and the ten people most important to the failure mode and effects analysis ("FMEA") of the ETC system. After accounting for overlap, twelve individuals had been identified, and those twelve individuals supposedly had their custodial files searched using the agreed-upon terms. Plaintiffs asserted that the productions had been unnecessarily delayed, pointing out that the exercise started in mid-February and still was not completed. Moreover, out of the twelve individual searches, Ford had advised that five of the individuals had no relevant documents in their files, and the remaining custodians had less than 150 documents. (*Id.*). According to Plaintiffs, the purported lack of documents found in the employees' custodial files demonstrated a problem with the search terms, and further raised a question as to how thoroughly Ford was looking for relevant documents. In response, Ford blamed Plaintiffs for the delay, arguing that Plaintiffs' search terms and phrases were too imprecise to maximize the responsive hits, causing the searches to return thousands of irrelevant documents that had to be reviewed by Ford before productions could occur. In addition, Ford contended that Plaintiffs were intransigent about changing the search terms, even though they yielded a vast number of unresponsive documents. (ECF No. 499 at 21-23). Two issues quickly became obvious to the Court. First, Ford was not forthcoming in sharing specifics about the results of the searches with Plaintiffs; thereby, hindering

modifications to the search terms and phrases. Second, the parties simply were not communicating well with each other. Accordingly, the Court suggested some different strategies to move the e-discovery forward, including face-to-face discussions between the parties' IT experts about how to refine the search terms and phrases.

On June 10, 2015, Plaintiffs advised the Court that another group of custodians had searched personal files for documents pertaining to unintended acceleration and ETC system faults, with very few responsive documents having been produced by Ford. (ECF No. 545 at 6-7). Ford responded by explaining that the custodians, all members of a critical concerns committee, simply did not communicate by e-mail regarding matters discussed in committee meetings. Ford confirmed that the custodians searched their e-mails for any documents pertaining to ETC and sudden unintended acceleration, and produced everything that was relevant. (*Id.* at 8-9).

By this time, both of the instant motions had been filed and briefed, with only one reply memorandum left to be submitted.

## II.   <u>The Parties' Positions</u>

### A. Motion to Quash and for Protective Order

In the motion to quash and for protective order, Ford asks the Court to prohibit Plaintiffs from seeking testimony from a corporate designee on four topics, identified as topics 15, 18, 78, and 79. (ECF No. 357 at 1-2). Topic 15 involves the identification and explanation of how Ford handled complaints of unintended acceleration. Topics 18 and 78 deal with Ford's document retention policies and practices, and its knowledge of the destruction or loss of any documents relating to unintended acceleration or stuck throttle incidents. Finally, topic 79 requests

testimony regarding the identity of Ford custodians whose files have been searched for relevant documents, and the process by which the custodians searched for documents.

Ford argues that topic 15 is overly broad and burdensome, requiring the corporate designee to learn details about numerous lawsuits and claims asserted against Ford over the years. Ford also states that it has provided Plaintiffs with all of the significant paperwork regarding prior claims and lawsuits; consequently, the information sought has already been supplied in a more convenient manner. With respect to topic 79, Ford contends that it seeks improper "discovery on discovery," and is overly burdensome given that each individual custodian performed his or her own unique search. Furthermore, Ford contends that the identities of the custodians and the manner in which they searched their files are protected from disclosure as attorney work product. Finally, Ford claims that topics 18 and 78 do not relate to a claim or defense in the cases and, therefore, are outside the scope of discovery permitted by Fed. R. Civ. P. 26. Ford stresses that no claim has been made that Ford has committed discovery abuses, or that there has been spoliation of evidence. For that reason, discovery of Ford's records retention policies and its knowledge of lost or destroyed records is irrelevant non-merits based discovery.

In their memorandum opposing Ford's motion, Plaintiffs allege that topic 79 is clearly a proper avenue of discovery in these cases given Ford's secretive approach to discovery. (ECF No. 392 at 5-12). Instead of cooperating with them, Plaintiffs claim that Ford has refused to provide any details about the efforts it has taken to respond to discovery. According to Plaintiffs, the lack of materials produced by Ford's critical witnesses is suspect, as are the delays in the productions. In support of their position,

Plaintiffs attach portions of deposition transcripts in which several of Ford's witnesses testified to having conducted limited or partial searches of their records, despite their roles as key players in the development, design, or analysis of Ford's ETC system. Plaintiffs disagree that the names of the custodians and their method of searching files are protected as work product, arguing that the underpinnings of how Ford reviewed its files for relevant documents constitute facts, not mental impressions or strategies of counsel. Moreover, if Plaintiffs are prohibited from discovering this information, they will likewise be precluded from evaluating the reasonableness of Ford's search.

Similarly, Plaintiffs contend that topics 18 and 78 are proper areas of inquiry under Rule 26(b)(1), which explicitly permits parties to discover facts about "the existence, description, nature, custody, condition and location of any ... documents." (ECF No. 392 at 14). Lastly, in regard to topic 15, Plaintiffs posit that Ford has failed to show that the topic is overly broad or burdensome. Plaintiffs emphasize that Ford has identified only two individuals who conducted investigations into claims of unintended acceleration and has produced only fifteen relevant documents. According to Plaintiffs, they are entitled to know how Ford investigated and handled complaints, claims, and litigation concerning unintended acceleration, as this area of inquiry will inform Plaintiffs of the measures taken by Ford to determine the cause of unintended acceleration and its conclusions, which are key to Plaintiffs' claims, and may also shed light on Ford's defenses.

### B. Motion for Reconsideration

In their motion for reconsideration, Plaintiffs ask the Court to change a "decision" made during the February 10, 2015 discovery conference, allowing Ford's

employees to conduct self-selected searches of their files. (ECF No. 393 at 1). Plaintiffs request a "transparent discovery process in which Ford discloses its collection methods and runs Plaintiffs' search terms across appropriate custodians and sources of documents." (*Id.*). Plaintiffs further seek a reversal of the Court's ruling that Ford need not produce documents relating to a BOA function implemented by Ford of Europe. Plaintiffs also ask that Ford be required to provide information about Ford's SlowE BOA installed in American-sold vehicles beginning with model year 2008, Ford of Europe's ETC system, and Ford's switch from a three-sensor accelerator pedal to a two-sensor pedal. In support of the motion, Plaintiffs argue the relevance of the information, as well as witness testimony that allegedly establishes the haphazard and unreliable search and collection procedures followed by Ford to date. (*Id.* at 2-4).

Ford opposes the motion by contending that Plaintiffs fail to provide justification for reconsideration. (ECF No. 444). Ford claims that the Ford of Europe information remains irrelevant to the Plaintiffs' claims, reiterating that the ETC system used in European model vehicles is entirely different from the ETC system at issue in the pending cases. In addition, Ford notes that the European BOA was triggered only in cases of a stuck accelerator pedal. Since Plaintiffs' allegations do not involve stuck accelerator pedals, the European BOA has no bearing on the instant actions. Finally, Ford contends that the Court should not reconsider its approval of a self-selection search method for several reasons. First, the searches conducted to date have been reasonable, and Ford can explain the cause underlying every perceived deficit in its document productions. Second, Ford stresses that the party best positioned to determine an efficient method of document location and retrieval is the

producing party. (ECF No. 444 at 15). Ford argues that it knows its employees and its document storage locations; as such, it should be permitted to conduct the searches as it sees fit, so long as the searches are reasonable.[3] Third, Ford contends that Plaintiffs only speculate as to the insufficiency of Ford's document collection and production. Ford points out that most of the Ford employees that have been deposed testified to conducting robust searches of their personal files. In Ford's view, Plaintiffs have failed to demonstrate any deficiencies that justify a plaintiff-driven collection process, or require close judicial supervision.

## III.   Relevant Law

Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter ... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Although the Rules do not define what is "relevant," Rule 26(b)(1) makes clear that relevancy in discovery is broader than relevancy for purposes of admissibility at trial. *Caton v. Green Tree Services, LLC,* Case No. 3:06-cv-75, 2007 WL 2220281, at *2 (N.D.W.Va. Aug. 2, 2007) (the "test for relevancy under the discovery rules is necessarily broader than

---

[33] Ford relies on statements by the Sedona Conference for this argument. "The Sedona Conference, a non-profit legal policy research and education organization, has a working group comprised of judges, attorneys, and electronic discovery experts dedicated to resolving electronic document production issues. With regard to electronic discovery many courts have looked to the Sedona Principles and Sedona Commentaries thereto, which are 'the leading authorities on electronic document retrieval and production.'" *DeGeer v. Gillis, 7*55 F.Supp.2d 909, 918 (N.D. Ill. 2010) (quoting *Romero v. Allstate Ins. Co.,* 271 F.R.D. 96, 106 (E.D.Pa.2010)).

the test for relevancy under Rule 402 of the Federal Rules of Evidence"[4]); *Carr v. Double T Diner,* 272 F.R.D. 431, 433 (D.Md. 2010) ("The scope of relevancy under discovery rules is broad, such that relevancy encompasses any matter that bears or may bear on any issue that is or may be in the case"). For purposes of discovery, information is relevant, and thus discoverable, if it '"bears on, or ... reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case. Although 'the pleadings are the starting point from which relevancy and discovery are determined ... [r]elevancy is not limited by the exact issues identified in the pleadings, the merits of the case, or the admissibility of discovered information.'" *Kidwiler v. Progressive Paloverde Ins. Co.,* 192 F.R.D. 193, 199 (N.D.W.Va. 2000) (internal citations omitted). Depending upon the needs of the particular case, "the general subject matter of the litigation governs the scope of relevant information for discovery purposes." *Id.*

Nevertheless, simply because information is discoverable under Rule 26 "does not mean that discovery must be had." *Schaaf v. SmithKline Beecham Corp.*, 233 F.R.D. 451, 453 (E.D.N.C. 2005) (citing *Nicholas v. Wyndham Int'l, Inc.,* 373 F.3d 537, 543 (4th Cir. 2004)). For good cause shown under Rule 26(c), the court may restrict or prohibit discovery that seeks relevant information when necessary to protect a person or party from annoyance, embarrassment, oppression, or undue burden or expense. Fed. R. Civ. P. 26(c). To succeed under the "good cause" standard of Rule 26(c), a party moving to resist discovery on the grounds of burdensomeness

---

[4] Under the Federal Rules of Evidence, relevant evidence is 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' *Boykin Anchor Co., Inc. v. Wong,* Case No. 5:10-cv-591-FL, 2011 WL 5599283 at * 2 (E.D.N.C. Nov. 17, 2011) (*citing United Oil Co., v. Parts Assocs., Inc,* 227 F.R.D. 404, 409 (D.Md. 2005)).

and oppression must do more to carry its burden than make conclusory and unsubstantiated allegations. *Convertino v. United States Department of Justice,* 565 F. Supp.2d 10, 14 (D.D.C. 2008). The party resisting discovery, not the party seeking discovery, bears the burden of persuasion. *See Kinetic Concepts, Inc. v. ConvaTec Inc.,* 268 F.R.D. 226, 243–44 (M.D.N.C. 2010)(citing *Wagner v. St. Paul Fire & Marine Ins. Co.,* 238 F.R.D. 418, 424–25 (N.D.W.Va. 2006).

In addition, Rule 26(b)(2)(C) requires the court, on motion or on its own, to limit the frequency and extent of discovery, when (1) "the discovery sought is unreasonably cumulative or duplicative;" (2) the discovery "can be obtained from some other source that is more convenient, less burdensome, or less expensive;" (3) "the party seeking the discovery has already had ample opportunity to collect the requested information by discovery in the action;" or (4) "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii). This rule "cautions that all permissible discovery must be measured against the yardstick of proportionality." *Lynn v. Monarch Recovery Management, Inc.,* 285 F.R.D. 350, 355 (D. Md. 2012) (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.,* 269 F.R.D. 497, 523 (D. Md. 2010)). To insure that discovery is sufficient, yet reasonable, district courts have "substantial latitude to fashion protective orders." *Seattle Times Co. v. Rhinehar*t, 467 U.S. 20, 36, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984).

Motions to reconsider interlocutory orders are governed by Fed. R. Civ. P. 54(b), which provides that "any order or other decision, however designated, that

adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b) "Notwithstanding that precept, it is improper to file a motion for reconsideration simply to ask the Court to rethink what the Court had already thought through—rightly or wrongly." *W.W. McDonald Land Co. v. EQT Prod. Co.,*983 F.Supp.2d 790, 819 (S.D.W.Va. 2014) (*quoting In re: C.R. Bard, Inc.,* 948 F.Supp.2d 589, 649 (S.D.W.Va.2013)). Guided by the principles set forth in Rule 59(e) and Rule 60, courts in this circuit generally have granted a motion for reconsideration only to satisfy one of the following conditions: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Id.* (citing *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.,* 148 F.3d 396, 403 (4th Cir. 1998)).

## IV.  Discussion

### A.  Motion to Quash and for Protective Order

Ford first asks for an order prohibiting Plaintiffs from inquiring into "the identification and explanation of how Ford handled complaints received relating to a possible SUA event during the Relevant Time Period, including what investigations, evaluation analysis, inspection Ford undertook or performed regarding these reported events, and what corrective action Ford took in response to any such reported SUA event" (topic 15). Ford's primary objection is the burden imposed upon it to educate a corporate designee about the details of each and every complaint, claim, and lawsuit lodged against Ford over a ten-year period. Plaintiffs respond that

the requested information is relevant and is not overly burdensome given that Ford has identified only 15 documents pertaining to its investigation of UA events.

Regardless of how many documents exist, preparing a corporate designee to answer detailed questions regarding specific claims, lawsuits, and investigations that have been lodged during a ten-year period would be difficult and, to a degree, would likely require preparation that is out of proportion to the benefits of the testimony. Plaintiffs do not contend that *every* incident of UA is related to the ETC system. Accordingly, requiring the designee to be fully familiar with the details of investigations in which another cause for the UA has been determined is a waste of time and resources. Therefore, the Court **GRANTS** Ford's motion for protective order to limit the inquiry under topic 15. Ford shall prepare its corporate designee to provide an overview of Ford's complaints, claims, and lawsuits involving UA events in the vehicle models at issue in the litigation, explaining the methods and processes used by Ford to investigate the allegations. The overview shall include details such as the number of complaints, claims, or lawsuits, the dates of assertion, the names of persons supervising any investigations, the general steps taken, any conclusions reached, and the outcome of the process. However, the corporate designee need not be prepared to discuss every minute detail of the individual investigations. To the extent that Plaintiffs wish to inquire regarding specific claims, lawsuits, or documents, Plaintiffs shall identify, at least ten (10) days prior to the deposition, the documents, claims, or lawsuits which will be the subject of inquiry.

Ford moves to quash topics 18 and 78, arguing that questions regarding Ford's document retention policies and potential loss or disposal of relevant documents constitute irrelevant "non-merits" discovery and are improper in the absence of a

threshold showing that spoliation or discovery abuse has occurred. Along the same line, Ford contends that topic 79, seeking information regarding Ford's document collection and production in this case, should be quashed because it is irrelevant "discovery on discovery" and invades attorney work product. The Court **DENIES** Ford's motion to quash these topics.

In its Cooperation Proclamation, the Sedona Conference notes that the "costs associated with adversarial conduct in pre-trial discovery have become a serious burden to the American judicial system;" particularly, in light of e-discovery. *See* The Sedona Conference, *The Sedona Conference Cooperation Proclamation* (Nov. 2012). Cooperation in a transparent discovery process is the path to efficient, cost-effective litigation and achieves the purpose of the federal discovery rules; that being, to reduce "gamesmanship" and to insure "forthright sharing of all parties to a case with the aim of expediting case progress, minimizing burden and expense, and removing contentiousness as much as practicable." *Id. (*citing *Board of Regents of the University of Nebraska v. BASF Corp.,* No. 4:04-cv-3356, 2007 WL 3342423, at *5 (D. Neb. Nov. 5, 2007). The 2006 amendments to Fed. R. Civ. P. 26(f) encourage cooperation and transparency early in the discovery process by requiring the parties to discuss at their initial conference "any issues about preserving discoverable information" and "any issues about disclosure or discovery of electronically stored information." Fed. R. Civ. P. 26(f)(1) and 26(f)(3). The Rule anticipates a sharing of facts and, if necessary, discovery about the sources to be searched for ESI. Fed. R. Civ. P. 26(f) advisory committee notes (2006) (stating that the "identification of, and early discovery from, individuals with knowledge of a party's computer systems may be helpful."). For some time now, federal courts have insisted on a collaborative

approach to discovery, recognizing that this attitude best achieves the "spirit and purposes" of the federal discovery rules. *Mancia v. Mayflower Textile Servs. Co.,* 253 F.R.D. 354, 357-58 (D. Md. 2008) ("It cannot seriously be disputed that compliance with the 'spirit and purposes' of these discovery rules requires cooperation by counsel to identify and fulfill legitimate discovery needs, yet avoid seeking discovery the cost and burden of which is disproportionally large to what is at stake in the litigation. Counsel cannot "behave responsively" during discovery unless they do both, which requires cooperation rather than contrariety, communication rather than confrontation."). Parties and attorneys that refuse to work collaboratively with their adversaries are at odds with the federal system and have been routinely sanctioned. *Id.* at 361 n.3. The obligation on the parties to meet and confer early in the case includes a "discussion that can and should include cooperative planning, rather than unilateral decision-making, about matters such as 'the sources of information to be preserved and searched; number and identities of custodians whose data will be preserved or collected ...; topics for discovery; [and] search terms and methodologies to be employed to identify responsive data ...'" *Ruiz-Bueno v. Scott,* 2013 WL 6055402, at *3 (S.D. Ohio Nov. 15, 2013) (quoting Millberg LLP and Hausfeld LLP, "E-Discovery Today: The Fault Lies not in Our Rules ...," 4 *Fed. Cts. L. Rev.* 131, 163 (2011). When two-way planning does not occur upfront, and questions about the adequacy of the document production subsequently arise, common sense dictates that the party conducting the search must share information regarding the universe of potentially relevant documents being preserved, and those that no longer exist, as well as the search terms used in collecting relevant documents and the identities of the custodians from whom the documents were retrieved. After all, the party

responsible for the search and production has the duty to demonstrate its reasonableness. *See Smith v. Life Investors Ins. Co. of America,* No. 2:07–cv–681, 2009 WL 2045197, at *7 (W.D. Pa. July 9, 2009) (citing *Victor Stanley, Inc. v. Creative Pipe, Inc.,* 250 F.R.D. 251, 262 (D.Md.2008)). Consequently, Ford's generic objections to "discovery on discovery" and "non-merits" discovery are outmoded and unpersuasive.

Here, there have been repeated concerns voiced by Plaintiffs regarding the thoroughness of Ford's document search, retrieval, and production. Although Ford deflects these concerns with frequent complaints of overly broad and burdensome requests, it has failed to supply any detailed information to support its position. Indeed, Ford has resisted sharing any specific facts regarding its collection of relevant and responsive materials. At the same time that Ford acknowledges the existence of variations in the search terms and processes used by its custodians, along with limitations in some of the searches, it refuses to expressly state the nature of the variations and limitations, instead asserting work product protection. Ford has cloaked the circumstances surrounding its document search and retrieval in secrecy, leading to skepticism about the thoroughness and accuracy of that process. This practice violates "the principles of an open, transparent discovery process." *DeGeer,* 755 F.Supp.2d at 929.

Contrary to Ford's contentions, discovery of document retention and disposition policies is not contingent upon a claim of spoliation or proof of discovery abuses, and may be accomplished through a Rule 30(b)(6) witness. *See Doe v. District of Columbia,* 230 F.R.D. 47, 55-56 (D.D.C., 2005) (finding that Rule 26(b)(1) may be construed to allow discovery into document retention and destruction policies

19

by permitting "[p]arties [to] obtain discovery regarding any matter, ... including the existence, description, nature, custody, condition, and location of any ... documents."); *Newman v. Borders,* 257 F.R.D. 1, 3 (D.D.C. 2009) ("That a party's document retention policies, including its policies as to electronically stored information, may be a fit subject of discovery cannot be gainsaid ... It is equally clear that a party must produce as its 30(b)(6) designee a person who can speak knowingly as to the topic and, if necessary, educate that designee so that she can do so."); *and Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 2007 WL 1054279, at *4 (D. Kan. Apr. 9, 2007) (stating that the topics of document retention policies and destruction, alteration, or loss of records are relevant and discoverable). Moreover, broader "discovery on discovery" may be appropriate and relevant under Rule 26(b) when it aids a party in the presentation of its case. *Ruiz-Bueno,* 2013 WL 6055402, at *1-2 (collecting cases). Plaintiffs have identified several instances in which document productions have been slow-to-come, incomplete, or inconsistent. Furthermore, they have supplied excerpts of deposition transcripts in which key employees testified to performing either limited searches for relevant documents, or no searches at all. The reservations expressed by Plaintiffs regarding the thoroughness of Ford's document production and the method by which its employees have conducted the review of their records are sufficiently corroborated to justify investigation into the reasonableness of Ford's search.

Ford's assertion that sharing facts about its search terms and the identities of custodians who searched their records will require disclosure of attorney work product is equally unavailing. *See FormFactor, Inc. v. Micro-Probe, Inc.,* 2012 WL 1575093, at *7, n. 4 (N.D. Cal. May 3, 2012) (finding that search terms and custodian

names are not work product and collecting cases). Ford argues that its counsel met with each custodian and discussed the case, and that based upon these communications, each custodian selected search terms and reviewed his or her personal files for documents. For that reason, Ford claims work product protection, citing cases that ostensibly support that position. However, as the court explains in *FormFactor*, "[s]uch information is not subject to any work product protection because it goes to the underlying facts of what documents are responsive to Defendants' document request, rather than the thought processes of Plaintiff's counsel." *Id.* Undoubtedly, the search terms used by the custodians and the names of the custodians that ran searches can be disclosed without revealing the substance of discussions with counsel. *See, also, Nissan North America, Inc. v. Johnson Electric North America, Inc.,* No. 09-CV-11783, 2011 WL 1002835, at *4 (E.D. Mich. Feb. 17, 2011) (stating that the party issuing document request "is of course entitled to know what search criteria was used in retrieving relevant ESI"); *Apple Inc. v. Samsung Electronics Co. LTD,* No. 12-CV-0630-LHK (PSG), 2013 WL 1942163, at *2 (N.D. Cal. May 9, 2013) (noting that case law suggests that search terms and choice of custodians used in the document collection and production process are not protected as attorney work product). Ford argues that its 30(b)(6) witness on this topic would likely be an attorney; however, that argument contradicts Ford's prior description of its document retrieval process as a "self-select" method by which the individual employees conducted searches of their own documents using terms of their own choosing. Thus, while Ford correctly notes that the deposition of a party's attorney is generally not permitted, Ford should also understand that it cannot avoid a legitimate area of inquiry simply by selecting an attorney as its corporate designee.

Ford's final objections are based upon the burdensomeness of preparing a corporate designee to testify regarding the actions of each custodian, and the cumulative nature of requiring a corporate designee to testify regarding document retention and destruction policies that have already been produced to Plaintiffs. With respect to the latter objection, having a written policy in hand does not obviate the need to have a corporate representative testify about the policy. Not only is a 30(b)(6) deposition of value to authenticate the policy and verify its relevance to the time frame in question, but the testimony of a corporate designee is useful to explain and clarify the policy and procedures, to provide the corporation's interpretation of the document, and to confirm how the policy was applied within the corporation. In regard to the burdensomeness argument, Ford again fails to supply any factual basis to support its claim. Certainly, if Ford had twenty people search for documents, preparing a witness to identify those individuals and report on the search terms used by them would not be extraordinarily burdensome. On the other hand, the task grows in difficulty as the number of custodians and search terms increase. Ford does not share this information; consequently, there is no good cause basis upon which the Court can find the required preparation to be burdensome.

Accordingly, Ford is **ORDERED** to produce a Rule 30(b)(6) witness to provide an overview of its claims investigation process, to testify regarding its document retention and destruction policies, and to supply details regarding the document search performed by Ford to date.

### B. Motion for Reconsideration

Plaintiffs first ask the Court to reconsider its ruling regarding the efficacy of the self-selection searches by Ford's custodians. Because the undersigned made no

specific ruling related to the reasonableness of the searches, Plaintiffs' motion for reconsideration on this point is **DENIED** as moot. At the February 10, 2015 hearing, the undersigned made it clear that while self-selection searches were not *per se* impermissible, Plaintiffs were not precluded from bringing a motion to compel and for sanctions if they believed that Ford's method of document search, retrieval, and production violated its obligations under the federal discovery rules; thereby, resulting in insufficient responses. Given that Plaintiffs are now challenging the reasonableness and adequacy of Ford's document search, the undersigned will construe their motion for reconsideration as a motion to compel. Plaintiffs ask the Court to order Ford to participate in a transparent discovery process in which "Ford discloses its collection methods and runs Plaintiffs' search terms across appropriate custodians and sources of document." (ECF No. 393 at 1). Plaintiffs also request that the Court "oversee" the process.

In light of the Court's ruling allowing Plaintiffs to proceed with a Rule 30(b)(6) deposition related to Ford's search and collection of documents responsive to discovery requests, Plaintiffs' demand for a more transparent process is **GRANTED**. Nevertheless, until Plaintiffs have deposed the designee and confirmed the nature of the document search performed by Ford, the Court is not in a position to rule on whether Ford has acted reasonably, or whether its production to date has been sufficient. Accordingly, to the extent Plaintiffs seek a ruling that Ford's prior search, retrieval, and production have been inadequate, the Court **DENIES** the motion as premature. After gathering the relevant details, Plaintiffs are given leave to file another motion if the facts so merit. Plaintiffs are reminded of their obligation to meet and confer in an effort to resolve any disagreements about the sufficiency of the

productions prior to filing the motion. Going forward, the Court **GRANTS** Plaintiffs' motion compelling Ford to disclose its collection methods, including the names of custodians whose records will be searched, and further **ORDERS** the parties to continue streamlining the process with agreed-upon search terms and phrases as previously instructed. In this regard, the parties are **ORDERED** to involve their IT experts and to consider other methods of searching such as predictive coding; perhaps, making use of the publications of the Sedona Conference. *See, e.g.,* Sedona's *Commentary on Achieving Quality in the E-Discovery Process* (2013), *Best Practices Commentary on the Use of Search & Information Retrieval Methods in E-Discovery* (2013), and *Commentary on Proportionality in Electronic Discovery* (2013). As the Court is already overseeing the process with bi-weekly discovery conferences and motion practice, the undersigned declines to take additional steps at this time to further supervise the process.

Plaintiffs next ask for an order compelling Ford to disclose information related to its SlowE/BOA, its conversion from a "2 track to 3 track system" in Class vehicles, and Ford of Europe's ETC system and BOA function. Once again, the undersigned has not made any rulings with respect to the SlowE/BOA and the conversion from a two sensor pedal to a three sensor pedal. As such, there is nothing for the Court to reconsider. If Plaintiffs have made discovery requests that cover these topics, and Ford has failed to properly respond, Plaintiffs should move to compel answers to the discreet requests, after having engaged in the necessary meet and confer sessions. These matters may also be addressed at the regular discovery conferences.

The undersigned did rule on Ford's obligation to produce documents from Ford of Europe regarding the European ETC system and BOA function, concluding

24

that the European ETC system was dissimilar to the system used in the Class Vehicles, and thus, the European documents were not relevant or likely to lead to admissible evidence. Furthermore, the undersigned found that more focused discovery needed to be completed in North America before a final determination could be made about the need for the parties to collect documents housed overseas. Applying the framework for evaluating motions to reconsider, the Court sees no basis upon which to reconsider its prior ruling related to Ford of Europe's documents. Until Plaintiffs can demonstrate through evidence rather than argument, that the ETC system in Ford of Europe's vehicles was sufficiently similar to the system used in the Class Vehicles, and the European BOA function dealt with something other than a stuck accelerator pedal, the undersigned continues to find that the burdens associated with conducting discovery overseas are disproportionate to the anticipated benefits of that proposed discovery. Therefore, Plaintiffs' motion to reconsider the Ford of Europe discovery is, at this time, **DENIED**.

The Clerk is instructed to provide a copy of this Order to counsel of record and any unrepresented party.

**ENTERED:** July 8 2015

Cheryl A. Eifert
United States Magistrate Judge